1
2
3
4
5
6
7            UNITED STATES DISTRICT COURT
8           SOUTHERN DISTRICT OF CALIFORNIA
9

10   ESTATE OF TIMOTHY GENE SMITH,        Case No.:  16-cv-2989-WQH-MSB
11   by his successor in interest Wyatt Allen
     Gunner Smith; SANDY LYNN             **ORDER**
12   SIMMONS; and WYATT ALLEN
     GUNNER SMITH,
13
14                          Plaintiffs,
15   v.
16   SCOTT HOLSLAG; NATALIE
     ANN MACEY, as an individual
17   doing business as Macey Bail
     Bonds; LEGAL SERVICE
18   BUREAU, INC., a California
     domestic corporation doing business
19   as Global Fugitive Recovery; DAN
     ESCAMILLA, as an individual and
20   on behalf of Legal Service Bureau,
     Inc.; CITY OF SAN DIEGO;
21   DAVID BRECHT; ISMAEL SOTO,
     as an individual; and DOES 1-50,
22   inclusive,
23
24                          Defendants.
25

26   HAYES, Judge:
27        The matters before the Court are the Motions for Summary Judgment filed by
28   Defendants Dan Escamilla (ECF No. 215); Sergeant Scott Holslag and City of San Diego

                                    1

(ECF No. 217); Natalie Ann Macey (ECF No. 219); and Sergeant David Brecht and City of San Diego (ECF No. 220).

## I.   PROCEDURAL BACKGROUND

On December 8, 2016, Plaintiffs filed a Complaint for damages based on the fatal shooting of Timothy Gene Smith by San Diego Police Department ("SDPD") Sergeant Scott Holslag. (ECF No. 1). On March 1, 2019, a Third Amendment Complaint ("TAC") was filed by Plaintiffs Wyatt Allen Gunner Smith—Smith's son; Sandy Lynn Simmons—Smith's mother; and Estate of Timothy Gene Smith ("Estate") by Smith's successor in interest, Wyatt Allen Gunner Smith, against Defendants City of San Diego (the "City"); SDPD Sergeant Scott Holslag; SDPD Sergeant David Brecht; bail bondsman Natalie Ann Macey d/b/a Macey Bail Bonds ("Macey"); Legal Service Bureau, Inc. d/b/a Global Fugitive Recovery ("Legal Service Bureau"); bail bondsman Dan Escamilla; and bail bondsman Ismael Soto. (ECF No. 162).

Plaintiffs allege that in November 2015, bondsmen Macey, Escamilla, and Soto fabricated a story that Smith was armed with a gun and had a history of violent crime. Plaintiffs allege that Escamilla and Soto provided false information to SDPD officers to engage their assistance in apprehending Smith's partner, Janie Sanders, who failed to appear in court after Macey paid her bail. Plaintiffs allege that on November 4, 2015, Sergeant Brecht gave SDPD officers a "Wanted" poster prepared by Escamilla and told the officers that Smith had felony warrants and was armed with a gun. Plaintiffs allege that at approximately 2:45 p.m., Smith was cornered by several officers in Pacific Beach. Plaintiffs allege that Smith was unarmed. Plaintiffs allege that Sergeant Holslag shot Smith three times, killing him, as Smith "stood with his hands raised in the air, empty, while turning to face the wall." (*Id.* ¶ 70).

Plaintiffs bring the following claims: 1) all Plaintiffs against Defendant Sergeant Holslag for violation of the Fourth Amendment of the United States Constitution under 42 U.S.C. § 1983; 2) Plaintiffs Wyatt Smith and Simmons against Defendant Sergeant Holslag for violation of the Fourteenth Amendment of the United States Constitution under 42

U.S.C. § 1983; 3) Plaintiff Estate against Defendants Sergeant Holslag and the City for violation of the Tom Bane Civil Rights Act ("Bane Act"), Cal. Civ. Code § 52.1; 4) all Plaintiffs against Defendants Sergeant Holslag and the City for battery; 5) all Plaintiffs against Defendants Sergeant Holslag, Sergeant Brecht, and the City for wrongful death under section 377.60 of the California Code of Civil Procedure; 6) all Plaintiffs against Defendants Macey, Escamilla, Soto, and Legal Service Bureau for conspiracy to violate civil rights under 42 U.S.C. § 1983; and 7) all Plaintiffs against Defendants Macey, Escamilla, Soto, and Legal Service Bureau for violation of the Fourth and Fourteenth Amendments under 42 U.S.C. § 1983. Plaintiffs seek damages, including exemplary and punitive damages, and attorneys' fees and costs.

On March 15, 2019, Defendants Macey, Sergeant Holslag, Sergeant Brecht, and the City filed Answers to the TAC. (ECF Nos. 164, 165). On March 21, 2019, Defendant Escamilla filed an Answer to the TAC. (ECF No. 168). On July 1, 2020, Defendant Legal Service Bureau filed an Answer to the TAC. (ECF No. 210). Defendant Soto has not appeared in this action.[1]

The parties engaged in fact discovery.

On August 17, 2020, Defendant Escamilla, proceeding pro se, filed a Motion for Summary Judgment. (ECF No. 215). On August 28, 2020, Motions for Summary Judgment were filed by Defendants Sergeant Holslag and the City (ECF No. 217); Defendant Macey (ECF No. 219); and Defendants Sergeant Brecht and the City (ECF No. 220).

On October 5, 2020, Plaintiffs filed Oppositions to the Motions for Summary Judgment filed by Defendants Sergeant Holslag and the City and Defendants Sergeant Brecht and the City. (ECF Nos. 229, 230). On October 6, 2020, Plaintiffs filed Oppositions to the Motions for Summary Judgment filed by Defendants Macey and Escamilla. (ECF Nos. 234, 235).

---

[1] On December 5, 2019, Plaintiffs filed Proof of Service as to Defendant Soto. (ECF No. 202). Defendant Soto has not filed any responsive pleading.

On October 13, 2020, Defendants Sergeant Holslag, Sergeant Brecht, the City, and Macey filed Replies in support of their Motions for Summary Judgment.[2] (ECF Nos. 244-247).

On November 12, 2020, the Court heard oral argument on the Motions for Summary Judgment.

On November 30, 2020, Plaintiffs filed a Supplemental Submission on the Civil Conspiracy Cause of Action. (ECF No. 252). On December 14, 2020, Defendants Macey and Escamilla filed Responses to the Supplemental Submission. (ECF Nos. 253, 254).

## II. FACTS

Defendant Natalie Ann Macey is the owner of Macey Bail Bonds, a Missouri sole proprietorship. On June 29, 2015, Macey posted $7,500.00 bail in Missouri for Janie Sanders, who was charged with possession of a controlled substance. On July 8, 2015, Sanders failed to appear at a hearing, and a warrant was issued for her arrest. Macey attempted to locate Sanders. A "Wanted" poster was created that included a picture of Sanders and her partner, Timothy Gene Smith. The poster stated that Sanders was wanted for "bail jumping" and was "WITH TIMOTHY GENE SMITH CONSIDERED ARMED AND EXTREMELY DANGEROUS." (First Wanted Poster, Ex. 14 to Iredale Decl., ECF No. 235-8 at 3).

Macey learned that Sanders and Smith might be in San Diego. Macey hired California bail fugitive recovery agent Defendant Dan Escamilla, an employee and shareholder of Defendant Legal Service Bureau, Inc., to apprehend Sanders. Defendant Ismael Soto, an unlicensed bondsman in California, was also engaged to assist with Sanders' apprehension. Escamilla created a second "Wanted" poster with the picture of Sanders and Smith. The poster stated that Sanders and Smith were "WANTED ON

---

[2] Defendants Sergeant Holslag, Sergeant Brecht, the City, and Macey also submitted evidentiary objections, which have been reviewed by the Court. (ECF Nos. 227, 244-3, 245-3, 247-3). The parties' evidentiary objections do not affect this Order.

4

EXTRADITABLE FELONIES OUT OF MISSOURI." (Second Wanted Poster, Ex. 17 to Iredale Decl., ECF No. 234-10 at 2). The poster stated, "SUBJECTS KNOWN TO BE HOMELESS AND ON FOOT IN THE PACIFIC BEACH AREA AS OF 11/4/15. CAUTION: CI HAS ADVISED THAT SUBJECT SMITH RECENTLY LEFT MISSOURI BY TRAIN ARMED WITH AN AK-47 and/or Revolver and is a convicted felon with a long criminal history of violent crimes." (*Id.*).

On November 3, 2015, Soto called SDPD and reported that two "fugitives," Smith and Sanders, had been traced to the Pacific Beach neighborhood. (Transcript of COSD000370-PD15-0369.wav, Ex. 5 to Iredale Decl., ECF No. 229-8 at 1; Audio Rec. of Soto Call, Disc Ex. 3A to Iredale Decl.). Soto told the dispatcher that Smith and Sanders were "supposed to be armed." (Transcript of COSD000370-PD15-0369.wav, Ex. 5 to Iredale Decl., ECF No. 229-8 at 1; Audio Rec. of Soto Call, Disc Ex. 3A to Iredale Decl.). Soto stated that "one of the fugitives is a little more serious then we're used to dealing with[,] [a]nd this guy's going away for life[.]" (Transcript of COSD000370-PD15-0369.wav, Ex. 5 to Iredale Decl., ECF No. 229-8 at 1; Audio Rec. of Soto Call, Disc Ex. 3A to Iredale Decl.). Soto stated that "everyone is telling us [Smith's] carrying a loaded .38 revolver and an AK-47." (Transcript of COSD000370-PD15-0369.wav, Ex. 5 to Iredale Decl., ECF No. 229-8 at 1; Audio Rec. of Soto Call, Disc Ex. 3A to Iredale Decl.). Soto gave the dispatcher a description of Smith and Sanders but provided an incorrect birthdate for Smith. At the time of the call, Smith had three outstanding warrants and a lengthy history of felony offenses dating back to 1986, including second degree burglary, unlawful use of a weapon, theft, fraud, forgery, and possession of a controlled substance. However, the dispatcher was not able to locate any warrants for Smith using his name and the birthdate provided by Soto.

Later on November 3, Escamilla called SDPD requesting police assistance. Escamilla, Soto, and a third bondsman believed they located Smith and Sanders in a bathroom at Fanuel Park in Pacific Beach. SDPD officers responded to the call, including Defendant Sergeant David Brecht. The dispatcher confirmed the warrant for Sanders but

told the responding officers that as to Smith, "at least NCIC, there's no warrants. There is no warrants." (Transcript of COSD000421-PD15-0369_51.wav, Ex. 5 to Iredale Decl., ECF No. 229-8 at 12; Audio Rec. of Police Radio, Disc Ex. 3A to Iredale Decl.). The suspects in the bathroom at Fanuel Park were not Smith or Sanders. Escamilla gave Sergeant Brecht either the second "Wanted" poster or the picture of Smith and Sanders from the poster.

On the morning of November 4, 2015, Soto called SDPD and stated that he could confirm an 800-meter radius of Smith and Sanders' location. Soto stated, "[W]e got word that the gentleman's carrying an AK-47 in his bag . . . . They're walking around with an AK and they're on drugs and I'm worried, ya know?" (Transcript of COSD000373-PD15-0369_3.wav, Ex. 5 to Iredale Decl., ECF No. 229-8 at 16-17; Audio Rec. of Soto Call, Disc Ex. 3D to Iredale Decl.). Soto stated, "Timothy Gene Smith has a 54 page rap sheet that will blow your mind. From child molestation to forgery. I mean, this guy's dangerous. They're both armed and on drugs. Apparently she carries a .38 and he carries an AK in his backpack." (Transcript of COSD000373-PD15-0369_3.wav, Ex. 5 to Iredale Decl., ECF No. 229-8 at 16-17; Audio Rec. of Soto Call, Disc Ex. 3D to Iredale Decl.).

During the SDPD morning lineup, Sergeant Brecht gave copies of Smith and Sanders' photograph to his team of officers, including Ricardo Escalante and Benjamin Douglas. Sergeant Brecht told the officers that Smith and Sanders were possibly armed. Shortly before 3:00 p.m., Officers Escalante and Douglas were patrolling the 1700 block of Garnet Avenue when they saw a male they believed was Smith. Officer Escalante stepped out of the patrol car, and Smith fled on foot. Officer Escalante chased and lost sight of Smith in a residential area of Pacific Beach.

Officer Escalante aired over the police radio that he was involved in a foot pursuit. The officers gave a description of Smith and stated, "Multiple warrants of out state. He's possibly armed with a .38." (Transcript of SDPD Dispatch Calls of 11-4-15, Ex. 4 to Sweda Decl., ECF No. 220-10 at 6; Audio Rec. of Police Radio, Disc Ex. 3 to Sweda Decl.). The dispatcher stated, "This might be the guy from yesterday . . . . He's got multiple warrants

from out of state." (Transcript of SDPD Dispatch Calls of 11-4-15, Ex. 4 to Sweda Decl., ECF No. 220-10 at 6; Audio Rec. of Police Radio, Disc Ex. 3 to Sweda Decl.). The dispatcher relayed, "It's a possible 10-35 subject"—armed and dangerous. (Transcript of SDPD Dispatch Calls of 11-4-15, Ex. 4 to Sweda Decl., ECF No. 220-10 at 8, 9; Audio Rec. of Police Radio, Disc Ex. 3 to Sweda Decl.). Multiple officers responded to the call, including a lieutenant who responds to high priority calls, an ABLE police helicopter, Sergeant Brecht, and Defendant Sergeant Scott Holslag.

Officers chased Smith to an area near 1636 Thomas Avenue, determined that he was likely in a storage shed, and set up a perimeter. Sergeant Holslag arrived at the scene and walked toward the entrance to the eastern side yard of 1636 Thomas Avenue with his police dog. Sergeant Holslag announced, "San Diego Police! If you don't come out you will be bitten by a police dog!" (Holslag & City's SOF, ECF No. 220-3 ¶ 33). Smith ran out of the storage shed towards the fence separating 1636 and 1644 Thomas Avenue, as the officers shouted. Smith was wearing tan shorts and was shirtless. Sergeant Holslag deployed the police dog and gave the bite command. The dog bit Smith's shoe but lost its grip as Smith jumped the fence and climbed onto a ledge protruding from the exterior wall of 1644 Thomas Avenue. The officers continued to yell at Smith to put his hands up, to get on the ground, to not reach, and to put his hands behind his back.

Sergeant Holslag states in his Declaration:

> I saw [Smith] plunge both hands deep into his pants pockets. His left hand appeared to me to be shallow, to knuckle-level. However, his right hand plunged deep into his right pocket . . . . I thought he had a handgun in his pocket and was reaching for it. The suspect looked straight at me with a thousand-mile stare . . . . The suspect's right hand started to come out of his right pocket. I was fearful that he was going to pull a handgun. As his hand came out to knuckle level, I was 100% convinced in the moment that he had a gun and was going to shoot me.

(Holslag Decl., Ex. 1 to Sweda Decl., ECF No. 217-7 ¶¶ 32-34). Sergeant Holslag shot Smith three times in his chest, right torso, and left torso, killing him. Smith was unarmed.

///

### III.   LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The materiality of a fact is determined by the substantive law governing the claim or defense. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).

The moving party has the initial burden of demonstrating that summary judgment is proper. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970). Where the party moving for summary judgment does not bear the burden of proof at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325; *see also United Steelworkers v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542-43 (9th Cir. 1989) ("[O]n an issue where the plaintiff has the burden of proof, the defendant may move for summary judgment by pointing to the absence of facts to support the plaintiff's claim. The defendant is not required to produce evidence showing the absence of a genuine issue of material fact with respect to an issue where the plaintiff has the burden of proof. Nor does Rule 56(c) require that the moving party support its motion with affidavits or other similar materials negating the nonmoving party's claim." (citations omitted)).

If the moving party meets the initial burden, the burden shifts to the opposing party to show that summary judgment is not appropriate. *See Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 322, 324. The nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient."). The

16-cv-2989-WQH-MSB

nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (citations omitted). The nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *See Anderson*, 477 U.S. at 256.

## IV.   JUDICIAL NOTICE

Defendants Sergeant Holslag, Sergeant Brecht, and the City request that the Court take judicial notice of the warrant for Smith issued on June 27, 2015, in connection with Case No. 15RY-CR00255, the warrant for Smith issued on July 13, 2015, in connection with Case No. W24155277, the warrant for Smith issued on October 14, 2015, in connection with Case No. 15CA-CR00999, and Smith's conviction history. (ECF Nos. 217-3, 220-2). Under Rule 201 of the Federal Rules of Evidence, the court may take judicial notice of "matters of public record," and facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (citation omitted). Smith's arrest warrants and conviction history are matters of public record, and Plaintiffs do not dispute their authenticity. Defendants' requests for judicial notice are granted.

## V.   DEFENDANTS SERGEANT HOLSLAG, SERGEANT BRECHT, AND THE CITY'S MOTIONS FOR SUMMARY JUDGMENT

Defendant Sergeant Holslag moves for summary judgment on the first claim for violation of the Fourth Amendment under 42 U.S.C. § 1983 and the second claim for violation of the Fourteenth Amendment under 42 U.S.C. § 1983[3]. Defendants Sergeant Holslag and the City move for summary judgment on the third claim for violation of the Bane Act and the fourth claim for battery. Defendants Sergeant Holslag, Sergeant Brecht, and the City move for summary judgment on the fifth claim for wrongful death.

_____

[3] Plaintiffs have represented that they will dismiss the Fourteenth Amendment claim. (*See* ECF No. 229 at 29). The Court does not address the Fourteenth Amendment claim.

### a. **Claim 1 - Fourth Amendment**

Defendant Sergeant Holslag contends that the individual heirs lack standing to bring a Fourth Amendment claim. Sergeant Holslag contends that qualified immunity protects him from liability. Sergeant Holslag contends that the use of deadly force was reasonable because Smith was "possibly armed" with a concealable handgun, resisted arrest, and "reached into his pockets and drew his hand in a threatening manner," leading Sergeant Holslag and other SDPD officers to "fear for their lives." (ECF No. 217-1 at 18-19). Sergeant Holslag contends that at the time of the shooting, it was not clearly established that the use of deadly force was unconstitutional under these circumstances.

Plaintiff contend that they have standing. Plaintiffs contend that the use of deadly force was unreasonable. Plaintiffs contend that at the time of the shooting, Smith was unarmed, Smith was not threatening officers or attempting to evade arrest, and Sergeant Holslag gave no warning prior to shooting Smith. Plaintiffs contend that at the time of the shooting, clearly established federal law prevented officers from shooting an unarmed man who did not pose an immediate threat to police or others.

### i. **Standing of Individual Heirs**

"'Fourth Amendment rights are personal rights which . . . may not be vicariously asserted.'" *Moreland v. Las Vegas Metro. Police Dep't.*, 159 F.3d 365, 369 (9th Cir. 1998) (alteration in original) (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)), *as amended* (Nov. 24, 1998). "Thus, the general rule is that only the person whose Fourth Amendment rights were violated can sue to vindicate those rights." *Id.* However,

> [i]n § 1983 actions, . . . the survivors of an individual killed as a result of an officer's excessive use of force may assert a Fourth Amendment claim on that individual's behalf if the relevant state's law authorizes a survival action. The party seeking to bring a survival action bears the burden of demonstrating that a particular state's law authorizes a survival action and that the plaintiff meets that state's requirements for bringing a survival action.

*Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1228-29 (9th Cir. 2013) (second alteration in original) (quoting *Moreland*, 159 F.3d at 369).

> California's statutory requirements for standing to bring a survival action are stated under California Code of Civil Procedure § 377.30: "A cause of action that survives the death of the person entitled to commence an action or proceeding passes to the decedent's successor in interest . . ., and an action may be commenced by the decedent's personal representative or, if none, by the decedent's successor in interest."

*Id.* at 1229 (quoting Cal. Civ. Proc. Code § 377.30).

In this case, all Plaintiffs bring a claim against Sergeant Holslag under § 1983 for violation of Smith's Fourth Amendment rights. The only proper Plaintiff under state law on this claim is Smith's Estate, through successor in interest Wyatt Smith. The Court concludes that individual heirs Simmons and Wyatt Smith lack standing to bring a Fourth Amendment claim against Sergeant Holslag.

### ii. Qualified Immunity

The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Because qualified immunity is an 'immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'" *Id.* (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). "Accordingly, 'we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" *Id.* at 232 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

"The qualified immunity inquiry consists of two parts: (1) 'whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right,' and (2) 'whether the right at issue was clearly established at the time of defendant's alleged misconduct.'" *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) (alterations in original) (quoting *Pearson*, 555 U.S. at 232). Courts have "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

1    1. <u>Violation of the Fourth Amendment</u>

2        To bring a claim against an individual defendant under § 1983, a plaintiff must show

3    "(1) that a person acting under color of state law committed the conduct at issue, and (2)

4    that the conduct deprived the claimant of some right, privilege, or immunity protected by

5    the Constitution or laws of the United States." *Leer v. Murphy*, 844 F.2d 628, 632-33 (9th

6    Cir. 1988) (citation omitted). "A person deprives another 'of a constitutional right, within

7    the meaning of section 1983, if he does an affirmative act, participates in another's

8    affirmative acts, or omits to perform an act which he is legally required to do that causes

9    the deprivation of which [the plaintiff complains].'" *Id.* at 633 (alteration in original)

10   (emphasis omitted) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)).

11       The Fourth Amendment protects the people against "unreasonable searches and

12   seizures." U.S. Const. amend. IV. "Apprehension by deadly force is a seizure subject to

13   the Fourth Amendment's reasonableness requirement." *Wilkinson*, 610 F.3d at 550. An

14   officer may use only the amount of force that is "'objectively reasonable' in light of the

15   facts and circumstances confronting" the officer. *Graham v. Connor*, 490 U.S. 386, 397

16   (1989); *see Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985). "The reasonableness of a

17   particular use of force must be judged from the perspective of a reasonable officer on the

18   scene, rather than with the 20/20 vision of hindsight." *Wilkinson*, 610 F.3d at 550 (quoting

19   *Graham*, 490 U.S. at 396). "In addition, '[t]he calculus of reasonableness must embody

20   allowance for the fact that police officers are often forced to make split-second

21   judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the

22   amount of force that is necessary in a particular situation.'" *Id.* (alteration in original)

23   (quoting *Graham*, 490 U.S. at 396-97). "Whether the use of deadly force is reasonable is

24   highly fact-specific, but the inquiry is an objective one." *Id.* at 551 (citations omitted).

25       The court "approach[es] an excessive force claim in three stages." *Thompson v.*

26   *Rahr*, 885 F.3d 582, 586 (9th Cir. 2018) (citing *Espinoza v. City & Cty. of San Francisco*,

27   598 F.3d 528, 537 (9th Cir. 2010)).

28       First, we assess the severity of the intrusion on the individual's Fourth

Amendment rights by evaluating the type and amount of force inflicted. Then, we evaluate the government's interests by assessing the severity of the crime; whether the suspect posed an immediate threat to the officers' or public's safety; and whether the suspect was resisting arrest or attempting to escape. Finally, we balance the gravity of the intrusion on the individual against the government's need for that intrusion.

*Id.* (citations omitted).

The "most important single element" is "whether the suspect poses an immediate threat to the safety of the officers or others." *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994). An officer "may not use deadly force to apprehend a suspect where the suspect poses no immediate threat to the officer or others." *Wilkinson*, 610 F.3d at 551 (quoting *Garner*, 471 U.S. at 11). However, "it is not constitutionally unreasonable to prevent escape using deadly force '[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Id.* (alteration in original) (quoting *Garner*, 471 U.S. at 11). "Only information known to the officer at the time the conduct occurred is relevant." *Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019) (citing *Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546-47 (2017); *Glenn v. Washington Cty.*, 673 F.3d 864, 873 n.8 (9th Cir. 2011)), *reh'g denied*, 2019 U.S. App. LEXIS 29633 (9th Cir. Oct. 2, 2019), *cert. denied*, *Browder v. Nehad*, 2020 U.S. LEXIS 4507 (Oct. 5, 2020).

"[I]n the deadly force context 'the person most likely to rebut the officers' version of events—the one killed—can't testify.'" *Estate of Elkins v. Pelayo*, 737 F. App'x 830, 835 (9th Cir. 2018) (quoting *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014)). Accordingly, the court "cannot simply accept what may be a self-serving account by the police officer." *Id.* (quoting *Cruz*, 765 F.3d at 1079). The court "carefully examine[s] 'all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, . . . to determine whether the officer's story is internally consistent and consistent with other known facts.'" *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (en banc) (second alteration in original) (quoting *Scott*

*v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). The court "must also examine 'circumstantial evidence that, if believed, would tend to discredit the police officer's story.'" *Id.* (quoting *Scott*, 39 F.3d at 915).

In this case, on November 4, 2015, Smith fled from Officer Escalante, leading him on a foot chase through a residential area of Pacific Beach. Sergeant Holslag states in his Declaration that just before 3:00 p.m., as he was refueling his vehicle after a lengthy SWAT standoff, he heard the radio call for the foot pursuit. (Holslag Decl., Ex. 1 to Sweda Decl., ECF No. 217-7 ¶ 7). Sergeant Holslag states that he "heard that the suspect was believed to be possibly armed with a .38 caliber handgun." (*Id.* ¶ 10). Sergeant Holslag states that he heard that Smith was wanted for "multiple warrants out of state." (*Id.* ¶ 11). Sergeant Holslag testified at his deposition that he understood that Smith was wanted for a felony warrant but did not know what crime Smith had committed. (Holslag Dep., Ex. 9 to Iredale Decl., ECF No. 229-12 at 58:22-59:13).

After officers arrived at the scene and set up a perimeter around the storage shed where Smith was hiding, Smith ran out of the shed, jumped the fence separating 1636 and 1644 Thomas Avenue, and climbed onto a ledge protruding from the exterior wall of 1644 Thomas Avenue. Smith was wearing tan shorts and was shirtless. Video recordings of the incident include video from body worn cameras by Officers Escalante, Douglas, Christopher Bernard, John White, Dustin Welsh, Corey Harris, and Brandon Orr, and video from the ABLE police helicopter. Officers shouted various commands to Smith at the same time, seconds before the shooting, including "Get your hands up;" "Let me see your hands;" "Get on the ground;" "Don't do it;" "Do not reach;" "Get your hands up;" "Keep your hands up;" and "Put your hands behind your back." (*See, e.g.*, Transcript of Bernard Body Worn Camera Video, Ex. 4 to Iredale Decl., ECF No. 229-7 at 5-6; ABLE and Body Worn Camera Video Recordings, Disc Ex. 2 to Iredale Decl.; Body Worn Camera Video Recordings, Disc Exs. 10, 13, 16, 19 to Sweda Decl.; *see also* Escalante Decl., Ex. 9 to Sweda Decl., ECF No. 217-14 ¶ 23; Bernard Decl., Ex. 12 to Sweda Decl., ECF No. 217-17 ¶ 16; White Decl., Ex. 18 to Sweda Decl., ECF No. 217-23 ¶ 8).

Sergeant Holslag states in his Declaration:

> I saw [Smith] plunge both hands deep into his pants pockets. His left hand appeared to me to be shallow, to knuckle-level. However, his right hand plunged deep into his right pocket . . . . I thought he had a handgun in his pocket and was reaching for it. The suspect looked straight at me with a thousand-mile stare . . . . The suspect's right hand started to come out of his right pocket. I was fearful that he was going to pull a handgun. As his hand came out to knuckle level, I was 100% convinced in the moment that he had a gun and was going to shoot me. In response I recall firing two to three rounds. I later learned I fired three rounds. I saw my first round hit him in the chest. Based on information and belief, I shot two more rounds, I then saw him fall to the ground.

(Holslag Decl., Ex. 1 to Sweda Decl., ECF No. 217-7 ¶¶ 32-34). Officer Bernard states in his Declaration:

> The suspect's eyes were wide open and wild looking. He had what I call a thousand-yard stare. He was looking around with his hands shoved into his pockets, reaching frantically in his pockets as if he was looking for something. Then I saw the suspect start to pull his hands out from his pockets. I thought I saw his left hand come out first. I saw something fall from his pocket as his hand was coming out. As I was processing this, simultaneously making the decision whether to shoot, I heard what I thought was two rounds fired. The suspect fell to the ground.

(Bernard Decl., Ex. 12 to Sweda Decl., ECF No. 217-17 ¶ 18). Officer Welsh states in his Declaration:

> After [Smith] looked around briefly, I saw him put his right hand into his right pocket pretty quickly, and then make a gripping of an object motion [to] pull something out. I did not know if he had an object in his hand and if so, I did not know what the object was. His motions while putting his hands into his pockets and pulling them from his pockets were rapid. He was not standing casually with his hands in his pockets. This was a frantic confrontation. Multiple officers were yelling commands at him. I did not observe him comply with any police commands. When the suspect quickly pulled his hand out of his pocket, that is when I heard three shots fired. The suspect fell from the shed.

(Welsh Decl., Ex. 21 to Sweda Decl., ECF No. 217-26 ¶¶ 7-8).

Officer Escalante states in his Declaration that he saw Smith turn to face the officers and "saw his hands move down to his waist area, around his pockets." (Escalante Decl., Ex. 9 to Sweda Decl., ECF No. 217-14 ¶ 21). Escalante states that he "considered whether [Smith] was possibly reaching for something but saw Sergeant Holslag draw his firearm." (*Id.*). Escalante states that he was looking away when the three shots were fired. (*Id.* ¶ 24). Officer White states in his Declaration that he "saw the subject reach for his pocket," heard the officers give commands to "stop reaching," and then "heard three shots." (White Decl., Ex. 18 to Sweda Decl., ECF No. 217-23 ¶ 8). Smith was unarmed at the time of the shooting.

Sergeant Holslag used deadly force, "implicat[ing] the highest level of Fourth Amendment interests." *A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016). The most severe crime that SDPD had probable cause to believe Smith committed at the time of the shooting was resisting arrest—a misdemeanor. *See* Cal. Pen. Code § 148. Viewing the facts in the light most favorable to Plaintiffs, at the time of the shooting Smith had climbed onto a ledge and was standing still. A reasonable juror could conclude that at the time of the shooting Smith did not pose an immediate threat to Sergeant Holslag or anyone else. Viewing the facts in the light most favorable to Plaintiffs, a reasonable juror could conclude that the severity of Smith's crime and Smith's actions did not render the use of deadly force reasonable under the Fourth Amendment. *See Thompson*, 885 F.3d at 586 (citations omitted); *see also Nehad*, 929 F.3d at 1136 ("Even if Nehad had made felonious threats or committed a serious crime prior to Browder's arrival, he was indisputably not engaged in any such conduct when Browder arrived, let alone when Browder fired his weapon. A juror could, therefore, conclude that the severity of Nehad's crimes, whether characterized as a misdemeanor or an already completed felony, did not render Browder's use of deadly force reasonable."). A reasonable juror could conclude that Sergeant Holslag's use of deadly force was objectively unreasonable under the Fourth Amendment.

///

## 2. <u>Clearly Established Federal Law</u>

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640 (citation omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741.

"[F]ew things in our case law are as clearly established as the principle that an officer may not 'seize an unarmed, nondangerous suspect by shooting him dead' in the absence of 'probable cause to believe that the [ ] suspect poses a threat of serious physical harm . . . .'" *Torres v. City of Madera*, 648 F.3d 1119, 1128 (9th Cir. 2011) (quoting *Garner*, 471 U.S. at 11); *see Nehad*, 929 F.3d at 1141 (holding that the "prohibition on the use of deadly force" where the suspect "was unarmed, had not said anything, was not threatening anyone, and posed little to no danger to [the officer] or anyone else" was "clearly established in 2015"); *Estate of Lopez v. Gelhaus*, 871 F.3d 998, 1020 (9th Cir. 2017) (explaining that the officer had "fair notice [in 2013] that the use of deadly force is unreasonable where the victim does not directly threaten the officer with the gun"), *reh'g denied*, 2017 U.S. App. LEXIS 26742 (9th Cir. Dec. 22, 2017), *cert. denied*, *Gelhaus v. Estate of Lopez*, 2018 U.S. LEXIS 3898 (June 25, 2018); *see also George v. Morris*, 736 F.3d at 832, 838-39 (9th Cir. 2013) (holding that a reasonable fact finder could find the use of deadly force constitutionally excessive where the victim held a gun pointed down, the victim did not take any action that could be viewed as objectively threatening, and the officers gave no warning); *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997) ("Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the

safety of others simply because they are armed."); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) ("[T]he police officers could not reasonably have believed the use of deadly force was lawful because [the victim] did not point the gun at the officers and apparently was not facing them when they shot him the first time.").

In this case, viewing the facts in the light most favorable to Plaintiffs, Sergeant Holslag shot Smith within a matter of seconds and without warning, even though Smith was unarmed, was not threatening anyone, and did not pose a danger to Sergeant Holslag or anyone else. The Court concludes that on November 4, 2015, Sergeant Holslag was on notice that under the circumstances reasonably presented by Plaintiffs, the use of deadly force against Smith would be objectively unreasonable. Further, although qualified immunity may apply where the government official makes a reasonable "mistake of fact," *Pearson*, 555 U.S. at 231 (citation omitted), Smith's actions and whether Sergeant Holslag could have reasonably perceived a threat to himself or others are disputed questions of fact that "preclude a grant of summary judgment on qualified immunity." *Nehad*, 929 F.3d at 1140; *see Morales v. Fry*, 873 F.3d 817, 824 (9th Cir. 2017). The Court concludes that Sergeant Holslag is not entitled to summary judgment based on qualified immunity. The Motion for Summary Judgment on the claim against Sergeant Holslag under § 1983 for violation of the Fourth Amendment is granted as to the claim by individual heirs Simmons and Wyatt Smith and denied as to the claim by the Estate.

### b. <u>Claim 3 - Bane Act</u>

Plaintiff Estate brings a claim against Sergeant Holslag and the City for violation of the Bane Act, Cal. Civ. Code § 52.1. Plaintiffs assert that Sergeant Holslag interfered by threats, intimidation, or coercion with Smith's constitutional right to be free from excessive force and with Smith's right to bodily integrity. Plaintiffs assert that the City is liable because Sergeant Holslag was acting within the course and scope of his employment.

Defendants Sergeant Holslag and the City contend that the Bane Act claim fails because Sergeant Holslag did not violate Smith's Fourth Amendment rights or act with an intent to violate Smith's Fourth Amendment rights. Plaintiffs contend that there is a

genuine issue of material fact as to whether Sergeant Holslag violated Smith's Fourth Amendment rights, and a reasonable juror could conclude that Sergeant Holslag acted with reckless disregard for Smith's rights.

The Bane Act "provides a cause of action for violations of a plaintiff's state or federal civil rights committed by 'threats, intimidation, or coercion.'" *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014) (quoting Cal. Civ. Code § 52.1). "[T]he Bane Act does not require the 'threat, intimidation or coercion' element of the claim to be transactionally independent from the constitutional violation alleged." *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018) (citing *Cornell v. City & Cty. of San Francisco*, 17 Cal. App. 5th 766, 798 (2017), *modified by* 2017 Cal. App. LEXIS 1018 (Nov. 17, 2017), *review denied*, 2018 Cal. LEXIS 1730 (Feb. 28, 2018)), *as corrected* (May 3, 2018), *reh'g denied*, 2018 U.S. App. LEXIS 19905 (9th Cir. July 18, 2018). However, proving a Fourth Amendment violation alone does not "vicariously trigger[ ] Bane Act liability. Instead, proving a Bane Act claim [ ] requires specific intent to violate protected rights[.]" *Sandoval v. Cty. of Sonoma*, 912 F.3d 509, 520 (9th Cir. 2018), *reh'g denied*, 2019 U.S. App. LEXIS 5100 (9th Cir. Feb. 21, 2019), *cert. denied*, *Cty. of Sonoma v. Sandoval*, 2019 U.S. LEXIS 5757 (Oct. 7, 2019). "Reckless disregard of the 'right at issue' is all that [i]s necessary" to demonstrate specific intent. *Cornell*, 17 Cal. App. 5th at 804.

In this case, the claim against Sergeant Holslag and the City for violation of the Bane Act is based on the same facts as the claim for excessive force under the Fourth Amendment. The Court has concluded that, viewing the facts in the light most favorable to Plaintiffs, a reasonable juror could conclude that Sergeant Holslag acted unreasonably under the Fourth Amendment when he shot and killed Smith. From these same facts, a reasonable juror could conclude that Sergeant Holslag acted with reckless disregard for Smith's rights. The Motion for Summary Judgment on the claim against Sergeant Holslag and the City for violation of the Bane Act is denied.

///

///

16-cv-2989-WQH-MSB

### c.  **Claim 4 - Battery**

All Plaintiffs bring a claim against Sergeant Holslag and the City for battery. Plaintiffs assert that Sergeant Holslag committed a battery when he shot and killed Smith and that the City is vicariously liable for Sergeant Holslag's actions.

Defendants Sergeant Holslag and the City contend that the battery claim fails because Sergeant Holslag's actions were reasonable under the Fourth Amendment. Sergeant Holslag and the City further contend that the individual heirs lack standing to bring a battery claim. Plaintiffs contend that there is an issue of material fact as to whether Sergeant Holslag's actions were reasonable under the Fourth Amendment, so there is also an issue of fact as to whether Sergeant Holslag committed battery. Plaintiffs contend that they have standing.

State law claims for battery are analyzed under the same standard as claims for excessive force under the Fourth Amendment. *See Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1273 (1998) ("A peace officer who uses unreasonable or excessive force in making a lawful arrest or detention commits a battery upon the person being arrested or detained as to such excessive force."). In this case, the claim against Sergeant Holslag and the City for battery is based on the same facts as the claim for excessive force under the Fourth Amendment. The Court has concluded that, viewing the facts in the light most favorable to Plaintiffs, a reasonable juror could conclude that Sergeant Holslag acted unreasonably under the Fourth Amendment when he shot and killed Smith. Accordingly, a reasonable juror could conclude that Sergeant Holslag committed a battery. However, individual heirs lack standing to bring this survival action claim. *See* Cal. Civ. Proc. Code § 377.30; *Hayes*, 736 F.3d at 1229. The Motion for Summary Judgment on the claim against Sergeant Holslag and the City for battery is granted as to the claim by individual heirs Simmons and Wyatt Smith and denied as to the claim by the Estate.

### d.  **Claim 5 - Wrongful Death**

All Plaintiffs bring a claim against Sergeant Holslag, Sergeant Brecht, and the City for wrongful death under section 377.60 of the California Code of Civil Procedure.

Plaintiffs assert that Sergeant Holslag committed a battery against Smith, causing his death. Plaintiffs assert that Sergeant Holslag was negligent in his use of excessive force. Plaintiffs assert that Sergeant Holslag and Sergeant Brecht negligently accepted unsubstantiated and false information, which was a substantial factor in causing Smith's death. Plaintiffs assert that the City is vicariously liable for Sergeant Holslag and Sergeant Brecht's actions.

### i. Standing of Individual Heirs

Defendants Sergeant Holslag, Sergeant Brecht, and the City contend that the individual heirs lack standing to bring a wrongful death claim. Plaintiffs contend that they have standing, and Simmons was financially dependent on Smith sufficient to confer standing.

"In California, an action for wrongful death is governed solely by statute, and the right to bring such an action is limited to those persons identified therein." *Scott v. Thompson*, 184 Cal. App. 4th 1506, 1510 (2010), *as modified on denial of reh'g* (June 25, 2010). Standing to sue for wrongful death is governed by section 377.60 of the California Code of Civil Procedure, which authorizes a cause of action "by any of the following persons or by the decedent's personal representative on their behalf: (a) The decedent's surviving . . . children, . . . or if there is no surviving issue of the decedent, the persons including the surviving spouse or domestic partner, who would be entitled to the property of the decedent by intestate succession." Cal. Code Civ. Proc. § 377.60(a).

Generally, where a decedent leaves issue, "his parents would not be his heirs at all and therefore not entitled to maintain [a wrongful death] action at all." *Chavez v. Carpenter*, 91 Cal. App. 4th 1433, 1440 (2001) (citations omitted). However, "[r]egardless of their status as heirs, parents may sue for the wrongful death of their child 'if they were dependent on the decedent.'" *Id.* at 1445 (quoting Cal. Code Civ. Proc. § 377.60(b)). "[D]ependence refers to financial support," which "generally presents a question of fact." *Id.* (citations omitted). The plaintiff must present evidence that at the time of the child's death, the surviving parents "were actually dependent, to some extent, upon the decedent for the necessities of life." *Hazelwood v. Hazelwood*, 57 Cal. App. 3d 693, 698 (1976).

> [A] parent cannot claim they are dependent within the meaning of Code of Civil Procedure section 377 if they receive financial support from their children which merely makes available to them some of the niceties of life they might not otherwise be able to afford. But, if a parent receives financial support from their child which aids them in obtaining the things, such as shelter, clothing, food and medical treatment, which one cannot and should not do without, the parent is dependent upon their child.

*Perry v. Medina*, 192 Cal. App. 3d 603, 610 (1987).

In this case, Wyatt Smith is the surviving child of Smith and has standing to bring a wrongful death claim as Smith's heir. *See* Cal. Code Civ. Proc. § 377.60(a). Simmons is the surviving parent of Smith. Simmons testified at her deposition that when Smith stayed with her, he always "helped [her] out" and gave her money for groceries and medicine. (Simmons Dep., Ex. 26 to Sweda Decl., ECF No. 217-31 at 29:23-30:1). Simmons testified that Smith did not give her "regular financial assistance" and did not send her money when he was not staying with her. (*Id.* at 30:6-9). Plaintiffs have failed to present evidence sufficient for a reasonable juror to conclude that Simmons was financially dependent, to some extent, on Smith for the necessities of life. *See Hazelwood*, 57 Cal. App. 3d at 698. The Court concludes that Simmons lacks standing to bring a wrongful death claim.

### ii. Sergeants Holslag & Brecht

Defendants Sergeant Holslag, Sergeant Brecht, and the City contend that the wrongful death claim fails because Sergeant Holslag's actions were reasonable, Sergeant Brecht did not owe any duty to Smith, and Sergeant Brecht's actions did not cause Smith's death. Plaintiffs contend that a reasonable juror could conclude that Sergeant Holslag's actions were unreasonable under the circumstances of this case. Plaintiffs contend that Sergeant Brecht caused a violation of Smith's rights by providing false, misleading, and unverified information about Smith to SDPD officers and failing to correct officers that repeated the information on the police radio. Plaintiffs contend that Sergeant Holslag was preconditioned to believe that Smith would shoot and kill him as a result of Sergeant Brecht's actions.

"The elements of the cause of action for wrongful death are the tort (negligence or other wrongful act), the resulting death, and the damages, consisting of the pecuniary loss suffered by the heirs." *Quiroz v. Seventh Ave. Ctr.*, 140 Cal. App. 4th 1256, 1264 (2006) (emphasis omitted) (citation omitted). When a plaintiff's wrongful death claim is premised on a defendant's negligence, the plaintiff must establish the standard elements of negligence to prevail. *See Hayes*, 736 F.3d at 1231. "[I]n order to prove facts sufficient to support a finding of negligence, a plaintiff must show that [the] defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Hayes v. Cty. of San Diego*, 57 Cal. 4th 622, 629 (2013) (alterations in original) (quoting *Nally v. Grace Comm'y Church*, 47 Cal. 3d 278, 292 (1988)).

The California Supreme Court "has long recognized that peace officers have a duty to act reasonably when using deadly force." *Id.* (citations omitted). "The reasonableness of an officer's conduct is determined in light of the totality of the circumstances." *Id.* This standard is "broader than the federal Fourth Amendment law, which tends to focus more narrowly on the moment when deadly force is used." *Id.* at 639.

> There will virtually always be a range of conduct that is reasonable. As long as an officer's conduct falls within the range of conduct that is reasonable under the circumstances, there is no requirement that he or she choose the "most reasonable" action or the conduct that is the least likely to cause harm and at the same time the most likely to result in the successful apprehension of a violent suspect, in order to avoid liability for negligence. It would be unreasonable to require police officers in the field to engage in the sort of complex calculus that would be necessary to determine the "best" or most effective and least dangerous method of handling an immediate and dangerous situation, particularly when officers are forced to make split-second decisions under tense and often perilous conditions.

*Brown v. Ransweiler*, 171 Cal. App. 4th 516, 537 (2009).

> Law enforcement personnel's tactical conduct and the decisions preceding the use of deadly force are relevant considerations under California law in determining whether the use of deadly force gives rise to negligence liability. Such liability can arise, for example, if the tactical conduct and decisions

23

show, as part of the totality of the circumstances, that the use of deadly force was unreasonable.

*Hayes*, 57 Cal. 4th at 639. Summary judgment is appropriate when, viewing the facts most favorably to the plaintiff, "no reasonable juror could find negligence." *Id.* at 632.

In this case, the cause of action against Sergeant Holslag for wrongful death is based on Sergeant Holslag shooting and killing Smith. *See id.* at 630 ("[T]his case involves only a single indivisible cause of action, seeking recovery for a single wrong—the shooting itself."). The Court has concluded that a reasonable juror could conclude that Sergeant Holslag did not act reasonably under the Fourth Amendment and committed battery. Viewing the facts in the light most favorable to Plaintiffs, a reasonable juror could conclude that under the totality of the circumstances Sergeant Holslag was negligent in shooting Smith. Sergeant Holslag is not entitled to summary judgment on the wrongful death claim.

Sergeant Brecht and the City contend that Sergeant Brecht took no preshooting actions that caused Sergeant Holslag to shoot Smith. Sergeant Brecht and the City contend that providing officer safety information about a possibly armed and dangerous suspect did not create a dangerous situation that was the proximate cause of Smith's death. Plaintiffs contend that Sergeant Brecht created a dangerous situation that resulted in Officer Holslag shooting Smith by providing unverified information about Smith to SDPD officers.

Sergeant Brecht responded to the call that Smith and Sanders were possibly at Fanuel Park on the day before the shooting. Sergeant Brecht spoke to Escamilla at the park, and Escamilla gave Sergeant Brecht either the second "Wanted" poster or the picture of Smith and Sanders from the poster. Sergeant Brecht states in his Declaration that on November 4, 2015, he gave copies of the photograph of Smith and Sanders to his squad at the lineup and "provided information about Smith and Sanders . . . for officer safety reasons[.]" (Brecht Decl., Ex. 1 to Sweda Decl., ECF No. 220-7 ¶ 10). Sergeant Brecht testified at his deposition that he told approximately fifteen officers at the lineup that Smith and Sanders were "supposedly armed and dangerous" and possibly had a .38 caliber handgun and an AK-47. (Brecht Dep., Ex. 10 to Iredale Decl., ECF No. 229-13 at 25:2-26:14). Officer

Douglas states in his declaration that Brecht told him that Smith was "considered extremely dangerous." (Douglas Decl., Ex. 15 to Sweda Decl., ECF No. 220-37 ¶ 3). Sergeant Holslag was not present at the lineup.

Sergeant Brecht responded to Officer Escalante's call about the foot pursuit of Smith. Sergeant Brecht heard Officer Douglas state that Smith had "multiple warrants from out of state" and was "possibly armed with a .38." (Transcript of SDPD Dispatch Calls of 11-4-15, Ex. 4 to Sweda Decl., ECF No. 220-10 at 6; Audio Rec. of Police Radio, Disc Ex. 3 to Sweda Decl.). Sergeant Brecht heard the dispatcher state that Smith had "multiple warrants from out of state" and was a possible "10:35"–armed and dangerous. (Transcript of SDPD Dispatch Calls of 11-4-15, Ex. 4 to Sweda Decl., ECF No. 220-10 at 6-8; Audio Rec. of Police Radio, Disc Ex. 3 to Sweda Decl.). Sergeant Brecht helped set up a perimeter around the shed. Sergeant Brecht did not use any force during the incident.

"Proximate cause 'limits the defendant's liability to those foreseeable consequences that the defendant's negligence was a substantial factor in producing.'" *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1206 (9th Cir. 2003) (quoting *Mendoza v. City of Los Angeles*, 66 Cal. App. 4th 1333, 1342 (1998)). "The proximate cause question asks whether the unlawful conduct is closely enough tied to the injury that it makes sense to hold the defendant legally responsible for the injury." *Mendez v. Cty. of Los Angeles*, 897 F.3d 1067, 1076 (9th Cir. 2018), *reh'g denied*, 2018 U.S. App. LEXIS 25361 (9th Cir. Sept. 6, 2018), *cert. denied*, *Cty. of Los Angeles v. Mendez*, 2019 U.S. LEXIS 1652 (Mar. 4, 2019). "Whether an act is the proximate cause of injury is generally a question of fact; it 'is a question of law where the facts are uncontroverted and only one deduction or inference may reasonably be drawn from those facts.'" *Ileto*, 349 F.3d at 1206 (quoting *Garman v. Magic Chef, Inc.*, 117 Cal. App. 3d 634, 638 (1981)).

Courts in this circuit have denied motions for summary judgment on negligence claims where a police officer creates a dangerous situation that results in another officer using lethal force. *See Dorger v. City of Napa*, No. 12-cv-00440-WHO, 2013 U.S. Dist. LEXIS 153696, at *33 (N.D. Cal. Oct. 24, 2013) (denying summary judgment on

negligence claim against officer who did not use force because "whether [the non-shooting officer]'s preshooting conduct (*e.g.*, her plan to detain [the victim], including the presence of armed officers) played a role in negligently provoking a dangerous situation that resulted in the use of reasonable or unreasonable use of lethal force, is relevant under the totality of the circumstances test"); *Howard v. Cty. of Riverside*, EDCV 12-00700 VAP (OPx), 2014 U.S. Dist. LEXIS 196517, at *27 (C.D. Cal. May 7, 2014) (denying summary judgment on negligence claim against officer who did not use force, explaining that "[a] reasonable jury could find that Sergeant Wedertz's decisions to direct Deputy Munoz to enter the shed and to open the closet door were a substantial factor in causing Plaintiff's injuries").

Viewing the facts in the light most favorable to Plaintiffs, Sergeant Brecht provided safety information that he received from the bondsmen that Smith was possibly armed to his squad of officers, which did not include Sergeant Holslag. Sergeant Brecht responded to the call about the foot pursuit of Smith and helped set up a perimeter. Sergeant Brecht did not directly communicate with Sergeant Holslag and did not use force during the incident. The Court concludes that no reasonable juror could find that Sergeant Brecht's actions created a dangerous situation that resulted in Sergeant Holslag using deadly force. The use of deadly force by Sergeant Holslag was not a foreseeable consequence of the officer safety information provided by Sergeant Brecht. The Court concludes that no reasonable juror could find that Sergeant Brecht's actions were a proximate cause of the shooting of Smith by Sergeant Holslag. Sergeant Brecht is entitled to summary judgment on the wrongful death claim.

### iii. The City

Defendant the City contends that it is entitled to summary judgment on the wrongful death claim because Plaintiffs failed to identify a statute or enactment in the TAC authorizing liability for wrongful death against the City. Plaintiffs contend that the City is liable based on respondeat superior.

Tort liability against the City "is dependent on the existence of an authorizing statute or 'enactment.'" *Searcy v. Hemet Unified Sch. Dist.*, 177 Cal. App. 3d 792, 802 (1986)

(citations omitted). Section 815(a) of the California Government Code provides that, "[e]xcept as otherwise provided by statute . . . [a] public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." Cal. Gov't Code § 815(a); *see Cowing v. City of Torrance*, 60 Cal. App. 3d 757, 761 (1976) ("There is no common law governmental tort liability in California; and except as otherwise provided by statute, there is no liability on the part of a public entity for any act or omission of itself, a public employee, or any other person."). "Since the duty of a governmental agency can only be created by statute or 'enactment,' the statute or 'enactment' claimed to establish the duty must at the very least be identified" in the complaint. *Searcy*, 177 Cal. App. 3d at 802.

Section 815.2 of the California Government Code "makes a public entity vicariously liable for its employee's negligent acts or omissions within the scope of employment." *Eastburn v. Reg'l Fire Prot. Auth*., 31 Cal. 4th 1175, 1180 (2003). "Since the enactment of the California Tort Claims Act in 1963 (§ 810 et seq.), a governmental entity can be held vicariously liable when a police officer acting in the course and scope of employment uses excessive force or engages in assaultive conduct." *Mary M. v. City of Los Angeles*, 54 Cal. 3d 202, 215 (1991).

In this case, the Court has determined that Sergeant Holslag is not entitled to summary judgment on the wrongful death claim. At the time of the shooting, Sergeant Holslag was acting in the course and scope of his employment as a police sergeant for the City. A reasonable juror could conclude that the City is vicariously liable for Sergeant Holslag's actions. The Court construes the claim against the City for wrongful death to be alleged under section 815.2 of the California Government Code. The Motion for Summary Judgment on the wrongful death claim is granted as to the claim by Simmons and as to the claim against Sergeant Brecht and is otherwise denied.

### e.  **Joinder**

Defendants Sergeant Holslag, Sergeant Brecht, and the City contend that Smith's surviving daughter must be joined under Rule 19 of the Federal Rules of Civil Procedure

to protect Defendants against the risk of incurring multiple obligations. Plaintiffs contend that there is no evidence that Smith had a daughter.

Rule 19 of the Federal Rules of Civil Procedure requires joinder of a person to a pending action if "in that person's absence, the court cannot accord complete relief among existing parties; or . . . that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may . . . as a practical matter impair or impede the person's ability to protect the interest; or . . . leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19.

In this case, Simmons testified at her deposition that Smith was not sure if he had a daughter. Simmons did not know any possible daughter's full name. (*See* Simmons Dep., Ex. 26 to Sweda Decl., ECF No. 217-31 at 15:17-17:7). The Court concludes that there is insufficient evidence that there is any other party required to be joined in this action.

The Motion for Summary Judgment filed by Sergeant Scott Holslag and City of San Diego (ECF No. 217) is granted in part and denied in part. The Motion is granted as to the first claim by individual heirs Wyatt Smith and Simmons for violation of the Fourth Amendment, the fourth claim by individual heirs Wyatt Smith and Simmons for battery, and the fifth claim by Simmons for wrongful death, and is otherwise denied. The Motion for Summary Judgment filed by Sergeant David Brecht and City of San Diego (ECF No. 220) is granted.

## VI.     DEFENDANTS ESCAMILLA AND MACEY'S MOTIONS FOR SUMMARY JUDGMENT

Defendants Escamilla and Macey move for summary judgment on the sixth claim for conspiracy to violate civil rights under 42 U.S.C. § 1983 and the seventh claim for violation of the Fourth and Fourteenth Amendments under 42 U.S.C. § 1983. Escamilla and Macey further move for summary judgment on the request for punitive damages.

///

///

1

### a. **Claim 7 - 42 U.S.C. § 1983**

2

All Plaintiffs bring a claim against Escamilla and Macey under § 1983 for violation

3

of the Fourth and Fourteenth Amendments. Plaintiffs assert that Escamilla and Macey acted

4

under color of state law by conducting a joint venture with SDPD. Plaintiffs assert that

5

Escamilla and Macey provided false information to police about Smith, increasing the

6

likelihood that excessive force would be used and constituting a substantial factor in

7

Smith's death.

8

Escamilla and Macey contend that Plaintiffs fail to submit evidence that Escamilla

9

and Macey acted under color of state law. Escamilla and Macey contend that they were

10

engaged in purely private conduct. Escamilla and Macey contend that Plaintiffs fail to

11

submit evidence that any of the information Escamilla or Macey provided was false.

12

Plaintiffs contend that Macey provided false information to Escamilla, who then

13

extensively coordinated with police and provided false information about Sanders and

14

Smith to induce SDPD to arrest Sanders, resulting in Smith's death.

15

An individual is not liable for the deprivation of rights under § 1983 unless they were

16

"acting under color of state law." *Leer*, 844 F.2d at 632-33 (citations omitted). Plaintiffs

17

do not enjoy civil rights protections against "private conduct abridging individual rights."

18

*Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1961). "[T]here is no rigid formula

19

for measuring state action for purposes of section 1983 liability. Rather, it is a process of

20

'sifting facts and weighing circumstances' which must lead [the court] to a correct

21

determination." *Ouzts v. Maryland Nat'l Ins. Co.*, 505 F.2d 547, 550 (9th Cir. 1974) (en

22

banc) (quoting *Reitman v. Mulkey*, 387 U.S. 369, 378 (1967)).

23

> A private individual's action may be "under color of state law" where there is
24
> "significant" state involvement in the action. *Johnson v. Knowles*, 113 F.3d
25
> 1114, 1118 (9th Cir.1997). The Supreme Court has articulated four tests for
> determining whether a private individual's actions amount to state action: (1)
26
> the public function test; (2) the joint action test; (3) the state compulsion test;
27
> and (4) the governmental nexus test. *Id.* . . . Under the joint action test, "courts
> examine whether state officials and private parties have acted in concert in
28
> effecting a particular deprivation of constitutional rights." *Gallagher v. Neil*

> *Young Freedom Concert*, 49 F.3d 1442, 1453 (10th Cir. 1995) . . . . The test
> focuses on whether the state has "'so far insinuated itself into a position of
> interdependence with [the private actor] that it must be recognized as a joint
> participant in the challenged activity.'" *Gorenc v. Salt River Project Agric.*
> *Improvement & Power Dist.*, 869 F.2d 503, 507 (9th Cir. 1989) . . . .

*Franklin v. Fox*, 312 F.3d 423, 444-45 (9th Cir. 2002); *see Jackson v. Pantazes*, 810 F.2d 426, 429 (4th Cir. 1987) (bail bondsman was a state actor where a police officer assisted the bondsman in entering the suspect's home and restrained the suspect while the bondsman searched her home).

Providing false information to the police does not automatically transform a private individual into a state actor. *See Arnold v. Int'l Bus. Machs. Corp.*, 637 F.2d 1350, 1357-58 (9th Cir. 1981) (a person who supplies inaccurate information that leads to arrest is not involved in joint activity with that state and is thus not liable under § 1983 (citing *Butler v. Goldblatt Bros., Inc.*, 589 F.2d 323, 327 (7th Cir. 1978)); *Daniel v. Ferguson*, 839 F.2d 1124, 1130 (5th Cir. 1988) ("Police reliance in making an arrest on information given by a private party does not make the private party a state actor.").

In this case, Macey attempted to locate Sanders after a warrant was issued for Sanders' arrest in Missouri. Macey testified at her deposition that another bondsman, Leland Chapman, created the first "Wanted" poster, and Macey posted it to her Facebook account. The poster stated that Sanders was wanted for "bail jumping" and was "WITH TIMOTHY GENE SMITH CONSIDERED ARMED AND EXTREMELY DANGEROUS." (First Wanted Poster, Ex. 14 to Iredale Decl., ECF No. 235-8 at 3).

Macey testified that the assertion that Smith and Sanders were "armed" came from talking to Smith and Sanders' former roommate, Tiffany Moore, who told Macey and Chapman that Smith and Sanders "had guns." (Macey Dep., Ex. B to Obra-White Decl., ECF No. 219-6 at 65:2-3). Tiffany Moore stated in her police interview that she told the bondsmen that Sanders and Smith had a gun. Macey testified that the "dangerous" assertion was added to the "Wanted" poster because Smith tried to run Macey over with his car when Macey located Smith and Sanders in Kansas City. (*Id.* at 65:2-20; 93:7-94:21). Macey

testified that "Leland was the one that found out about the AK-47." (*Id.* at 84:21-23). Macey learned that Sanders and Smith might be in San Diego and hired Escamilla to apprehend Sanders. Macey did not have any contact with SDPD before the shooting.

Escamilla created the second "Wanted" poster. The poster stated that Sanders and Smith were "WANTED ON EXTRADITABLE FELONIES OUT OF MISSOURI." (Second Wanted Poster, Ex. 17 to Iredale Decl., ECF No. 234-10 at 2). The poster stated, "SUBJECTS KNOWN TO BE HOMELESS AND ON FOOT IN THE PACIFIC BEACH AREA AS OF 11/4/15. CAUTION: CI HAS ADVISED THAT SUBJECT SMITH RECENTLY LEFT MISSOURI BY TRAIN ARMED WITH AN AK-47 and/or Revolver and is a convicted felon with a long criminal history of violent crimes." (*Id.*). Escamilla states in his Declaration that he obtained the information for the second "Wanted" poster from Macey, Chapman, and the first "Wanted" poster.

On November 3, 2015, Escamilla called SDPD requesting assistance in apprehending Smith and Sanders at Fanuel Park. Escamilla gave Sergeant Brecht either the second "Wanted" poster or the picture of Smith and Sanders from the poster. Escamilla states in his Declaration that his only communication with any SDPD member before the shooting was the "November 3, 2015 notification to S.P.P.D. dispatch of the intended activities on November 3, 2015, as is required by law (Penal Code § 1299.08) and, later that day, providing the photo, given to me by Natalie Macey and contained in the ['Wanted' posters] to Sgt. David Brecht." (Escamilla Decl., ECF No. 215-1 ¶ 7).

The asserted constitutional violation in this case is the use of lethal force by Sergeant Holslag in violation of the Fourth Amendment. Sergeant Holslag testified that he shot Smith because he believed that Smith was armed with a gun and was going to shoot him. Viewing the facts in the light most favorable to Plaintiffs, Macey assisted in the creation of a "Wanted" poster that stated that Smith was armed and dangerous. Escamilla used information provided by Macey and by the first "Wanted" poster to create the second "Wanted" poster, which he then provided to Brecht. Escamilla also provided this information to Soto, who told the police dispatcher that Smith was armed, dangerous, and

had a long history of violent crime. Viewing the facts in the light most favorable to Plaintiffs, Holslag heard on the police radio that Smith was possibly armed and dangerous and believed that Smith had a gun when he shot Smith.

The Court concludes that Macey providing information to Escamilla, and Escamilla providing information to SDPD about Smith, even if false, did not constitute joint participation with SDPD in the use of lethal force. Plaintiffs have failed to present evidence sufficient for a reasonable juror to conclude that Macey or Escamilla acted in concert with SDPD in the deprivation of Smith's Fourth Amendment rights. *See Franklin*, 312 F.3d at 445 (quoting *Gorenc*, 869 F.2d at 507). The Court concludes that Plaintiffs have failed to present facts sufficient to show that either Macey or Escamilla was a state actor rather than engaged in "private conduct." *Burton*, 365 U.S. at 722; *see Ouzts*, 505 F.2d at 555 ("[W]e [ ] know that the bail bondsman is in the business in order to make money and is not acting out of a high-minded sense of devotion to the administration of justice . . . . [T]he bondsman was acting 'to protect his own private financial interest and not to vindicate the interest of the state.'" (quoting *People v. Houle*, 13 Cal. App. 3d 892, 895 (1970)). The Motions for Summary Judgment on the claims against Macey and Escamilla for violation of § 1983 are granted.

### b.  Claim 6 - Conspiracy

All Plaintiffs bring a claim against Macey and Escamilla for conspiracy to violate civil rights under § 1983. Plaintiffs assert that Macey, Escamilla, Legal Service Bureau, and Soto conspired to deprive Smith of his constitutionally protected rights under the Fourth and Fourteenth Amendments by providing false information about Smith to SDPD with the expectation that SDPD would use excessive force. Plaintiffs assert that the bondsmen agreed with each other to obtain SDPD's participation in Sanders' arrest by falsely telling SDPD that Smith was a violent, armed criminal.

Macey and Escamilla contend that they did not conspire with SDPD to deprive Smith of his constitutional rights. Macey contends that she hired Escamilla to apprehend Sanders. Macey and Escamilla assert that the information provided was not false. Plaintiffs contend

32

that a reasonable juror could conclude that Macey and Escamilla conspired with each other and Soto to falsify information, resulting in the use of excessive force by Sergeant Holslag.

"To establish a conspiracy under § 1983, a plaintiff must satisfy the following elements: (1) the existence of an express or implied agreement among the defendant officers to deprive him of his constitutional rights; and (2) an actual deprivation of those rights resulting from that agreement." *Avalos v. Baca*, 596 F.3d 583, 592 (9th Cir. 2010).

> Conspiracy is not itself a constitutional tort under § 1983. *See Cassettari v. Nev. Cnty.*, 824 F.2d 735, 739 (9th Cir. 1987) ("The insufficiency of these allegations to support a section 1983 violation precludes a conspiracy claim predicated upon the same allegations."); *Landrigan v. City of Warwick*, 628 F.2d 736, 742 (1st Cir. 1980) ("[M]ere proof of a conspiracy is insufficient to establish a section 1983 claim.") (quoting *Hampton v. Hanrahan*, 600 F.2d 600, 622 (7th Cir. 1979), *rev'd in part on other grounds*, 446 U.S. 754, 100 S. Ct. 1987, 64 L. Ed. 2d 670 (1980)). It does not enlarge the nature of the claims asserted by the plaintiff, as there must always be an underlying constitutional violation. Conspiracy may, however, enlarge the pool of responsible defendants by demonstrating their causal connections to the violation; the fact of the conspiracy may make a party liable for the unconstitutional actions of the party with whom he has conspired. Conspiracy in § 1983 actions is usually alleged by plaintiffs to draw in private parties who would otherwise not be susceptible to a § 1983 action because of the state action doctrine, *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010); *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002), or to aid in proving claims against otherwise tenuously connected parties in a complex case, *see Gilbrook* [*v. City of Westminster*], 177 F.3d [839,] 856-58 [(9th Cir. 1999)].

*Lacey v. Maricopa Cty.*, 693 F.3d 896, 934-935 (9th Cir. 2012), *superseded by statute on other grounds*.

In this case, the conspiracy claim is based on the same facts as the claim against the bondsmen for violation of § 1983. The underlying constitutional violation in this case is the use of excessive force by Sergeant Holslag against Smith. Viewing the facts in the light most favorable to Plaintiffs, the bondsmen provided information to each other and to SDPD that Smith was armed with one or more guns and had a history of violent crime, in order to

induce SDPD's assistance in arresting Sanders. There is insufficient evidence of a causal connection between Macey and Escamilla's actions and the assertedly unconstitutional actions of Sergeant Holslag. Plaintiffs have not come forward with evidence sufficient for a reasonable juror to conclude that Escamilla and Macey conspired with SDPD to deprive Smith of his right to be free from excessive force. The Motions for Summary Judgment filed by Defendants Dan Escamilla (ECF No. 215) and Natalie Ann Macey (ECF No. 219) are granted.

## VII.  CONCLUSION

IT IS HEREBY ORDERED that the Motion for Summary Judgment filed by Defendant Dan Escamilla (ECF No. 215) is granted.

IT IS FURTHER ORDERED that the Motion for Summary Judgment filed by Defendants Sergeant Scott Holslag and City of San Diego (ECF No. 217) is granted in part and denied in part. The Motion is granted as to the first claim by individual heirs Wyatt Smith and Simmons for violation of the Fourth Amendment, the fourth claim by individual heirs Wyatt Smith and Simmons for battery, and the fifth claim by Simmons for wrongful death, and is otherwise denied.

IT IS FURTHER ORDERED that the Motion for Summary Judgment filed by Defendant Natalie Ann Macey (ECF No. 219) is granted.

IT IS FURTHER ORDERED that the Motion for Summary Judgment filed by Defendants Sergeant David Brecht and City of San Diego (ECF No. 220) is granted.

Dated:  December 31, 2020

Hon. William Q. Hayes
United States District Court

16-cv-2989-WQH-MSB